16-1112, people of the state of Illinois, Clinton, Appalachia, and Ricardo Garcia, defendants' accounts. Arguing on behalf of the defendant's accounts, Mr. Kerry D. Goetsch. Arguing on behalf of Clinton, Appalachia, Ms. Cora Wall. Good morning, counsel. Mr. Goetsch. Good morning, your honors. My name is Kerry Goetsch, and I represent Ricardo Garcia. There are two issues in this case, but there's sort of a common theme to both of them, in that the state is arguing in both that this court should equate facilitating a transaction with accountability for a crime. Being in a chain of events does not equal being accountable. Accountability requires a shared criminal intent or a common criminal design, and that just wasn't proven in this case. The evidence here isn't really disputed, so it's not an issue of taking witnesses as to be credible or not. Mr. Garcia was convicted of first-degree murder and mob action based on accountability for driving two men to a certain area of Elvedere and starting to drive off. The men then got back into his car after they committed the crime. But he knew that the facts are, and the record reflects that he knew that that other, that where he was driving them was rival gang territory. And there was discussion in the car, was there not, once they got in the car of they were going to get at someone in that rival gang territory. And there was evidence certainly earlier at the party that night that one of the men who had gotten in the car, I believe it was Perez, had a gun. So that, those facts go to establishing that the defendant wasn't just involved after the fact, wasn't involved as necessary after the fact, but really was part of a common design before and during the offense. Well, I think if we go into the facts a little bit more, Garcia and his girlfriend were pulling away from the party before these two men got in the car. So it wasn't as though Garcia was like, hey, come along with me or... No, they were going to get beer. Beer and cigarettes, correct. Okay, but then... The area that they went to was, if you look on the map, it's about four minutes away. It's not as though they were traveling a great distance to go. Yes, it was known for being rival gang territory. And yes, there is this statement about get at. Two problems with that as far as proof goes is that it's not shown that Garcia actually had heard those words. It was his girlfriend, Patton, that testified to hearing one of the guys say, I want to get at someone. In the car, though. Those statements were made in the car. But she also testified that she did not know, even though she had seen Perez with a gun earlier that night, she didn't see any weapons when they got into the car. And so if you're counting, if you're taking Patton at her word, then if she didn't know, then Garcia didn't know. Get at is also sort of an ambiguous term. She testified it could mean talking to someone. And there's actually a case law, I found a case that I didn't cite. People will be died in the fourth district where they talk about whether get is inherently a violent threat or not. And in that case, they say get is just as apt a word for non-violent punishment as it is for violent punishment. And in that case, somebody said, I'm going to get you. And so the discussion was whether I'm going to get you means something violent or not. Well, it doesn't have to necessarily mean exclusively something violent if you just consider it with all the other factors, right? It's not like we isolate. It almost does have to because for the state to prevail, they're relying almost exclusively on this get at statement. They did a trial. That's sort of imputing knowledge to Garcia that something criminal was about to happen. But I don't think that you can say get at means something criminal necessarily, even in this context. Really, really? I mean, get at, a rational jury couldn't meet. You're getting in your car, and then two fellow gang members come up and say, hey, give us a ride over to rival gang territories, just as Zeno said, because we want to get at something. You put that in that context, it's not to do any violence to anyone. I mean, again, we're looking at it as a rational fact finder. Fortunately, in this case, we sort of have an insight into what the jury was thinking because they sent a couple notes out. And they asked for the definition of legal responsibility vis-a-vis the driver, what clarification of during is. And they also asked, does the law present during the preparation of offense and fled the scene mean he is legally responsible? So the jury in this case wasn't necessarily concerned with get at as far as whether that showed that Garcia was part of the planning of the commission of this offense. They're worried about his role as the driver. And I think that sort of brings us to that second issue, though, is to state. Before you go to the second issue, his role as the driver. I mean, these guys get them. They jump out of the car in rival gang territory, and then he drives slowly around. And then they jump back in the car after the shots are fired. And then he flees. Right. I mean, it's not like he dropped the love and said, OK, have a nice day. And then took off going 30 miles an hour down the street. He basically waited for him. Well, I don't think he basically waited for them. I think if you actually look at a map of the area, the. Right there. So you have to turn the direction. And yes, both eyewitnesses testified that he drove away slowly, but he was still driving away. If he was part and parcel of this plan, it's not even clear that Garcia. Well, it's not even clear that Perez and Figueroa, the two shooters, knew what they were going to do. Because if you take Patton's testimony, she didn't see anybody in the area. And these three guys, the victim and the two others, were sitting in a car. It's not clear that you could even see that there was anyone there. And so if Perez and Figueroa weren't sure what they were going to do when they got out of the car, it's impossible to say that Garcia did. You know, he could have been driving away slowly just to see what they were going to do. And so I don't think the fact that he was driving away slowly impedes knowledge of what was going to happen if he knew what these two guys were going to do. Again, he didn't know they were armed until they came back to the car. And that's when they saw the guns. Well, I mean, given the evidence, there certainly could have been an inference that he, if Patton had seen the gun earlier, that he may have seen the gun earlier. We don't have to know definitively. But he may have known that. Well, but that's the problem. I mean, the jury couldn't make those inferences. We're making inference after inference. We're inferring Patton's knowledge onto them. We're inferring that Garcia saw them armed earlier. We're inferring that Garcia heard what Patton heard. We're inferring all of these things. Right. And once you get to a certain point of inferring pretty much every factor, all we're really left with for sure is that he was the driver. I mean, if you look at it, what role does it play? As long as they're reasonable inferences, you can rely on them. If they're not assumptions, we're not assuming things, but we're looking at reasonable inferences from the evidence, a jury can rely on those. But we sort of are assuming. I mean, we're assuming that he saw what Patton saw. We're assuming that he saw. That's different. You're just arguing that we have inference upon inference. My comment is as to inferences. I understand. If we're going to assume things, you cannot assume him guilty. I understand that. But if the evidence raises reasonable inferences that a fact finder can look at, that's enough. I've never heard of a case where you can't stack reasonable inferences. Well, I think what's interesting about this case is that Patton wasn't charged. And what is her role? Obviously, she was a passenger. Well, she was offered use immunity. Right, but just for her testimony. Right. But she wasn't charged. And all of these inferences come through her. So she knew that Perez had a gun. She knew that Perez wanted to get at somebody. She knew all of these things. And she just as much facilitated them getting there. I mean, okay, she wasn't behind the wheel. But her involvement in this case is very smallly from Garcia's. I mean, just because he's the driver. I mean, being the driver in the context of being a getaway driver is different than being a passenger, yes. But before and during the offense, her knowledge is just as much as Garcia's. And yet the state didn't charge her. Well, we can't speculate as to why the state chose not to charge her. But we also can look at the driver's actions afterwards to inform what his intentions were earlier or what he knew. I mean, he fled. He drove at high speeds. He did not say to the police, I have nothing to do with this, once they finally caught him. He tried to run and get out of the car once the rims of the tires were gone and they had to stop, et cetera. You can infer his guilt, I think, from his actions afterwards as well. Well, I mean, that is a separate crime. And I think that's what the Taylor case talks about is that just because somebody facilitates the escape afterwards doesn't mean that they knew what was going to happen before it. And I think that's very important in a case like this where he was obviously the driver and he helped him get away and freaked out when the police were chasing him and ended up getting shot by the police when he tried to run. But that doesn't equate with knowledge before or during this murder. It's a factor that can be considered by the finder of fact, right? Yes. And I think that's what the finder of fact was focused on based on their questions. And I think that's why the second issue is so important is because the state argues in closing that facilitating an action is equivalent to being accountable. And that's just not true. The action of selling somebody jeans or taking your kids to the park has nothing to do with criminal accountability. There has to be a plan. There has to be a common criminal intent or a common criminal design. And that's why those examples that the state uses are so prejudicial in this case because it allows the jury to think, well, he was the driver.  The state says that's enough. The parent facilitated the kids getting to the park. Garcia facilitated these two men getting to Little Village. That's sufficient to convict. But it's not. Well, assuming that these arguments were inartful or these examples were inartful, I think it's clear what they were saying. And I think in the state's rebuttal argument they clarified if they maybe were implying that there was no agreement that needed to be expressed in their opening argument by this example. I think they clarified in the rebuttal argument when they said, remember, we don't need to prove words, expressed words. So I think they clarified that they weren't saying there doesn't need to be any agreement, but it doesn't need to be in words per se. So the jury, of course, got the correct instructions here. And so it would be hard to say that they would be misled by this, let's say, the park example, for one. Well, I don't think it's hard to say that because if you look at their questions, their questions are specifically on that issue. And you don't have to facilitate the transaction to be accountable. If you're part of the planning, if you have knowledge of the planning and you stay back at the house part, if you say, hey, you guys, here's some guns, go get these guys, and you know what's going to happen, you're accountable. But if you drive in there and have no idea what they're going to do, you're not accountable. So by equating facilitating a transaction with accountability, it's just wrong, even though, yes, they tried to clarify that maybe they were trying to say you don't need a verbal agreement. First of all, they should have said that specifically instead of saying an expressed agreement. I mean, there could be a lot of different ways of expressing an agreement. But the examples they gave are still prejudicial, even though they're trying to couch it and rebuttal in terms of a lack of verbal agreement. You don't have to be part of the chain of causation to be accountable. And so the main thing about the two ways of being accountable, common criminal design or shared criminal intent, and those examples don't embody that. There's nothing criminal about either. So by equating common day agreements with accountability, that's where the prejudice is. It's not in just saying we're facilitating a transaction. It's because facilitating a transaction actually isn't necessary. So I know that my time is up. Well, I mean, the jeans example, I mean, the clerk, somebody comes into a store and is looking for jeans. I mean, it's reasonable, a reasonable inference that that person would like to buy jeans if they find ones that fit. So when the clerk says, oh, yeah, they're over here, the clerk is helping them buy the jeans. I understand it's not a criminal act, but, I mean, I can certainly see, again, inartful, probably shouldn't have been used as a hypothetical, but, I mean, they are actually facilitating with knowledge of the purpose what that person is doing, are they not? Well, yes, the jeans example, they are facilitating a transaction. That has nothing to do with criminal accountability. I mean, yes, it has something to do with the plan to sell jeans, but the clerk isn't then liable for what the person does after that. Well, no, the clerk has, again, the hypo, and I don't mean to defend this hypo, but the hypo is that the clerk is accountable for the purchase of the jeans. It's not a criminal act. I understand that, but they're making a hypothetical, well, actually, an analogy, I guess it would be, to a crime versus a non-crime, but putting it in the same context of I didn't walk up to you and say, I would like to purchase jeans, will you please help me purchase jeans? And the person says, yes, I will help you. But what happened was I walk up and I say, do you know where they are? And you show them to me, so theoretically, you're accountable as the clerk for my purchase of the jeans. But you're not accountable. No, you are. You facilitated the purchase of the jeans. Right. But you have zero legal accountability for anything that occurs after that. I mean, that's the problem. Legal accountability requires criminal intent. I understand. I think we're just talking in circles here. Okay. You'll have time on the phone. Ms. Moy? Good morning, Your Honor. Good morning. My name is Cora Moy. I'm captain for people. I would like to first address the accountability issue, and then I'll move into the closing arguments. Defense counsel seems to, I think, minimize the, or I guess broadly interpret some of the facts in this case. So, for instance, defense counsel mentioned that Garcia couldn't have heard the get at, like, how do we know that Garcia heard that the two co-defendants in the back said, we want to get at these people? Obviously, the defendant must have heard something, because why else, if he had initially gone to get beer, have gone into rival territory and brought these men with him? But there's, there has to have been. Well, they could have just said, take us there. They didn't have to, he didn't necessarily have to hear what they were going to do there. Or the reason that they wanted to be taken there. And I think the argument was made also that this is an ambiguous statement, get at. Why is it not ambiguous? How can the jury infer something different? I believe that the jury in this case, and I think in this specific case, the jury didn't infer something different. It was argued below, and on cross-examination, defense counsel asked, could get at someone mean going and talking to them? So the jury did hear that argument, that this could have been some kind of innocent act, where the defendant took them there. But given the rest of the totality of the circumstances, the jury found otherwise, that he must have known what was going to happen, whether or not that the two men were going to batter rival gang members, or whether or not to kill them. And I think looking at the totality of the circumstances, that night, the two men in the back were asking the defendant to bring them to rival gang territory right before midnight. This is in the middle of the night. I think it's a reasonable inference that there is going to be some kind of criminal activity that was going to occur. And the fact that the defendant dropped them off, I believe Herman Estrada testified that he saw that the vehicle came to a complete stop, let them out, slowly moved, stopped after the shots occurred, and let the men back into the vehicle. I think that all shows that the defendant knew that the co-defendants did not have innocent plans in going to rival gang territory that night. Well, knowing that they didn't have innocent plans is something different than being part of a common design, isn't it? That is. I misspoke. I meant in terms of there was going to be some kind of criminality that was going to happen, whether or not that was going to be a battery or some other criminal activity was going to happen. I didn't mean innocent in that. I didn't mean that his intention was to get out there innocently, but that he knew there was going to be some kind of criminal offense that would occur that night. Additionally, when a defendant voluntarily associates with a group that's bent on a legal act, given that this defendant is part of the Latin Kings with the co-defendants, I think that's an additional factor that this Court should consider in the light most favorable to the people under a reasonable now case. So weren't the prosecutors two examples that were given misstatements of the law on accountability? No, they were not. Why not? I believe what the trial attorneys, the prosecutors, were getting at with two examples were that we did not need an expressed agreement. And by expressed, I believe that they used that term as a legalese. When we say expressed, we mean an explicit agreement that somebody says out loud, I agree to this plan. I believe that these two examples that the prosecutors used, they said them to show that you didn't need to say I agree out loud. We can show them by circumstantial evidence. I believe Justice Berg mentioned that even though there is no agreement, at least for the blue jeans selling, they all knew and were trying to facilitate the sale. So it's the unspoken agreement that I believe the prosecutor was getting at. And if you look at what the prosecutor said before and after the two examples, before the examples were given, the prosecutor read the instruction on accountability. And then after, he explains how the defendant shared a common plan of getting ex-rival gang members that night and provided transportation. So it's about not saying I agree. The defendant does not have to say I agree for the jury to find that he's guilty under an accountability theory. And I believe Justice Enoff mentioned in rebuttal that the prosecutors kind of clarified that you didn't need an expressed agreement. Well, assuming that the statements were, there was error in this closing argument, was the evidence here closely balanced? Wasn't it closely balanced evidence in this case? No, it was not. Again, given the totality of the circumstances, it's adjourned to reasonably infer that the defendant knew that the co-defendants were going to commit some kind of a criminal offense. Well, but we know that only through Patton's testimony. Or is there more evidence?  I don't believe it hinges on whether or not the defendant could have seen the gun in the car with him. The fact is he drove these men to rival gang territory in the middle of the night, heard shots, heard gunfire, multiple rounds, at least seven, if not more, and then doesn't disassociate with those members. Instead, he stops the vehicle, lets them back into the car, and leaves the police on a high-speed car chase. He breaks several traffic violations, blows out two tires, and that's the only time he decides to stop the vehicle is because he has to, because those tires have been blown out. So the totality of all of that shows that he knows what the plan is, he was in on the plan, and therefore this court should affirm his conviction. Well, talk about second prong at this point of plain error. I mean, if, again, we're to assume that these statements were misleading, erroneous, or the examples that were given, they were on the central or about the central issue in this case, which is criminal accountability. Why wasn't this plain error second prong? Why wasn't this error so serious that it jeopardized the fairness and the integrity of these proceedings? So I believe when we analyze second prong plain error analysis, it's usually about structural errors, and I believe those errors have to do with, and I could be wrong about this, I know I wrote it in my brief, but they have to do with zero principles if you didn't ask them this. A principle is so damaging to the trial that the defendant didn't have, that it undermined the fairness of the trial. These examples, they were not, there was no clear or obvious error, and I think that's the hump that we have to get over in order to do the true prong analysis, is whether or not this was a clear and obvious error. And the statement teems that there was no clear error because the prosecutors were discussing whether or not an express agreement needed to be said. If whether or not the defendant needed to say, I agree, I agree to the criminality of the plan. And that's not what the, these examples say that, or these examples that the prosecutors used just wanted to show that one does not have to explicitly say, I agree. In Buckley and Carvajal, the errors there can't be classified as structural error, can they? No. Right, but the court still reversed on the second point of error. I thought my reading of those cases were, at least for Buckley, that one, they said that the prosecutor misstated the requisite state of mind, and because the prosecutor equated recklessness with carelessness, that has to do with mental state. So I thought, and I could be wrong in my notes, but I actually don't recall that it was under a plenary analysis. I thought it was just an error that they found, and so that's why we didn't do the two-prong analysis. And then in the other case, I believe that the state misstated, the court found that the state misstated accountability when it believed the defendant's testimony, that he did not have knowledge of the Code of Defendant's Intention, and I think, again, that's a little bit different than what we have here. So you're saying your understanding of the second prong is that it's limited to structural error? It's not limited, but this also does not, it's not limited to structural errors, but if this court were to find an error in the closing argument, it does not rise to the level of a structural error. So unless there are any more questions. I mean, do we look at whether or not these remarks could have been or were a material factor in the jury reaching its verdict? I believe that would be speculation. Pardon? I believe that would be speculation. Again, I think those examples that prosecutors used were only used to show that the defendant did not need to say, I agree to your plan. Isn't there a risk, though, that by using the example of the parents driving the kids to the park, that he was suggesting to the jury that merely driving a person to a destination is in and of itself evidence of accountability? Isn't there a risk of that? I think the remarks may have been unlawfully stated, but I think the jury instructions clarifies that there's no risk because there were proper jury instructions that were given. And I think what's more telling is that the defense attorney did not object at trial to these examples. So the fact that defense counsel did not object and that the correct jury instructions were given and the fact that the defendant and the fact that words of agreement are not needed to establish a common design, I think that all shows that these examples were not prejudicial to them. Anything else? No, thank you. Thank you very much. Thank you. And Stephen, I think you were from the defense commission. Thank you. Mr. Getsch? I just wanted to talk a little bit more about the second issue. We're sort of focused on this words of agreement. And, no, words of agreement aren't necessary, but there has to be proof of an agreement, and that's why those examples don't work. Proof of an agreement of criminal intent or criminal design. And so if I drive my kid to the park and my kid beats up another kid in the sandbox, I'm not responsible, legally accountable, for my kid committing battery because I drove them to the park. If I agreed beforehand and said, let's go to the park so you can beat up that neighbor kid, then I am. And that's why these examples fail. Isn't that the argument that the defendant's attorney made to the jury? That was kind of his argument, wasn't it? That the parents didn't intend for the fight, the parents didn't plan the fight, they're not accountable for the fight. Merely taking the kids to the park is not accountable. So he answered that argument, correct? He answered the argument, correct. But that doesn't prevent the jury from relying on the State's examples of accountability in saying driving to the park is sufficient. In contravention of the jury instructions. Well, I mean, again, they asked about accountability as far as whether the driver was accountable, when does before and during end, basically, is part of their question. And so, you know, they obviously had some questions about whether his role in this, being the driver and driving, escaped. I mean, his involvement in the escape is undeniable. But that doesn't show that he shared the criminal intent or criminal design. And that's why those examples are so prejudicial. This thing could have been an example of a drug, somebody selling drugs, and those people, okay, there doesn't have to be a verbal agreement between the two people facilitating the transaction of a drug sale. That's an example of accountability, because they clearly know that they're committing a crime. But when you talk about just simply driving somebody somewhere or facilitating a legal transaction, that really muddies the water. Because there has to be this. Sometimes we read too much into jury's questions. I mean, one juror could have had a question. Who knows what happens in a jury room? You don't get to read that much into that. But you're not contesting the jury instructions. I mean, they were properly given to the jury, correct? Correct. I look at the quote from Glasper, which talks about a hypothetical not being so prejudiced, that the jurors ignored the instructions and based its decision on a make-believe situation. Why does that not apply here? Well, no, they're not basing their decision on a make-believe situation. Obviously, they were considering the facts of this case. But it goes to the closeness of the evidence. I mean, we do have to rely on patent. The state was saying even without patent, there's evidence to admit. That's not true. I mean, there's evidence that he facilitated an escape. But patent is the key here. And she said she didn't know they were armed. She said she didn't know they were in general. She would have gotten out of the car. And so, you know, under the first prong of, I think there's quite clearly the closeness of the evidence, as far as accountability for the first prong of plain error. It doesn't have to be. I mean, maybe for the second prong, it has to go to the jury believe this fanciful situation. But even under the first prong here, I think we have plain error. I mean, do we look at all at whether we should find that the remarks were a material factor in the conviction? I don't know that you can. To say that when the evidence is close like this, you know, the remarks don't have to be a material factor. They have to be enough to tip the scale, basically. Right. But, I mean, material factor, if counsel had preserved this error, and we were looking at this in a harmless error situation, that's the test. So tell me why would a defendant come out better when they don't preserve an error than when they do? Well, I mean, the outcome here would be probably the same because the evidence is so close. So you're saying it was a material factor? Well, the evidence was so close that these hypos tipped the scales. Correct. So a tip of scales is an equal material factor? I would say so, yes. I mean, in a closely balanced situation. I mean, if you're talking about a material factor such that the trial wasn't fair, then, I mean, that's another question. Okay. Thank you very much, counsel, for your arguments. The Court will take the matter under advisement and run her decision in due course.